UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ADAM LAFATA,

       Plaintiff,

v.                                           Civil Case No. 13-cv-10755
                                           Honorable Patrick J. Duggan

DEARBORN HEIGHTS SCHOOL
DISTRICT NO. 7,

       Defendant.

_____/

## OPINION AND ORDER (1) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND (2) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Adam LaFata ("Plaintiff") filed this lawsuit against Defendant Dearborn Heights School District No. 7 ("School District") when the School District revoked a conditional job offer after learning the results of Plaintiff's preemployment physical examination.  Plaintiff alleges that the School District's conduct violated the Americans with Disabilities Act ("ADA"), Title II of the Genetic Information Non-Discrimination Act of 2008 ("GINA"), and Michigan's Persons With Disabilities Civil Rights Act ("PWDCRA").[1] Currently pending before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The Court held a hearing with respect to the

_____

[1]As set forth *infra*, Plaintiff no longer is pursuing his claim under GINA.

motions on December 5, 2013.  For the reasons that follow, the Court concludes that summary judgment should be entered in favor of Plaintiff and against the School District.  As such, the Court grants Plaintiff's motion and denies the School District's motion.

## I.      Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323, 106 S. Ct. at 2553.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that

2

there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255, 106 S. Ct. at 2513.

A court reviewing cross-motions for summary judgment, must evaluate each motion on its own, applying the above standard. *Westfield Ins. Co.*, 336 F.3d at 506 (citing *Taft Broad Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

## II.    Factual and Procedural Background

On July 26, 2010, Plaintiff submitted an application for the position of Plant Engineer with the School District. Plaintiff's application reflected that he had

3

worked as a building supervisor at the Lincoln Park Community Center for the last ten years. (ECF No. 15 Ex. 3.) In that position, as also reflected on his application, Plaintiff was responsible for complete maintenance of the inside and outside of the building, HVAC, minor plumbing and electrical work, roof repairs, maintenance of refrigeration equipment for the ice rink, set up and care of the community pool, closing the pool, set up and resurfacing of the ice rink, operating and repairing the Zamboni, set up and tear down for ice shows and events, and selling and scheduling ice time. (*Id*.) Plaintiff regularly used ladders and carried objects weighing more than forty pounds in the building supervisor position. (*Id*. Ex. 18 at 9-12.)

The School District's Director of Operations, John Nicholls, interviewed Plaintiff for the Plant Engineer position on August 26 and 30, 2010. Mr. Nicholls described the duties of the position during the interview, including that it required physical labor such as climbing ladders and lifting more than fifty-five pounds. (ECF No. 15 Ex. 5 at 33-35, 63-64, 67-68.) According to Mr. Nicholls, when asked if he would have any problem with the "physical labor" required, Plaintiff answered: "No problem." (*Id*. at 57.)

Following the second interview, Mr. Nicholls extended a conditional offer of employment to Plaintiff. As conditions of employment in the public schools,

4

School District Board Policy and state law require every applicant to: (1) be fingerprinted and pass a criminal history check; (2) successfully pass a drug test; and (3) pass a physical reflecting that they are able to perform the essential functions of the position.  The School District contracts with Midwest Health Systems ("Midwest") to perform the required physical examination.

Dr. Joel Perlson, who works for Midwest, conducted Plaintiff's examination on September 7, 2010.  According to Dr. Perlson's testimony during his deposition in this case, he tested Plaintiff for squatting, standing, stooping, and balance.  (ECF No. 15 Ex. 15 at 17.)  Plaintiff performed "adequately" for squatting, standing, and stooping (*id.* at 17-18); however, Dr. Perlson had concerns about Plaintiff's balance based on the manner in which he climbed onto the examination table.  (*Id.* at 19-20.)  Dr. Perlson explained that Plaintiff "climbed onto the table very slowly, moving one limb at a time, balancing himself as he went along, slowly turning around and then sitting down on the table."  (*Id.* at 19.)

After observing the way Plaintiff climbed onto the table, Dr. Perlson left the examination room and had someone from Midwest request a job description from the School District for the position Plaintiff was seeking. (*Id.* at 20.)  Dr. Perlson then returned to the exam room and asked Plaintiff to pull up the legs of his pants to above his knees.  (*Id.* at 21.)  Dr. Perlson noted that Plaintiff had muscle atrophy

5

in his legs.  (*Id*. at 22.)  Dr. Perlson then asked Plaintiff if he could walk on his

heels or toes, which Plaintiff could not do.  (*Id*.)

Dr. Perlson asked Plaintiff if he wears leg braces and Plaintiff responded that

he sometimes did, but that he had not worn them that day.  (*Id*.)  Dr. Perlson then

asked Plaintiff to remove his shirt so he could examine his shoulder girdle, arms,

wrists, hands, and ankles.  (*Id*.)  Dr. Perlson noticed only muscle atrophy in

Plaintiff's hands.  (*Id*.)  To determine whether Plaintiff had any resulting weakness,

Dr. Perlson asked Plaintiff to squeeze his fingers.  (*Id*.)  According to Dr. Perlson,

Plaintiff's strength "seemed adequate."  (*Id*. at 23.)

Based on his observations, Dr. Perlson opined that Plaintiff had Charcot

Marie Tooth syndrome, a genetic disorder that causes muscle deterioration and

gradual loss of strength.  (*Id*. at 23, 30.)  Dr. Perlson shared his diagnosis with

Plaintiff, but did not ask him if he had any physical symptoms or limitations.  (*Id*.

at 24.)  During the examination, Dr. Perlson also did not ask Plaintiff any questions

concerning his current employment duties or employment history.  (Ex. 15 at 16.)

As Dr. Perlson explained during his deposition, he does not find that information

relevant in determining whether a prospective employee can physically do the job

for which he or she is applying.  (*Id*.)  At the conclusion of the examination, Dr.

Perlson provided Plaintiff with a note to take to his family doctor reflecting his

6

findings and requesting certain information.  (*Id*. at 34; *see also id*. Ex. 12.)

Plaintiff took the note to Dr. Nancy Sabal, who examined Plaintiff on or about September 9, 2010.  (*Id*. Ex. 12.)  Dr. Sabal indicated on the note that she too diagnosed Plaintiff with Charcot Marie Tooth syndrome; however, she concluded that Plaintiff's strength was "more than adequate for his job and daily activities." (*Id*.)  Dr. Sabal wrote that Plaintiff was "suitable" for the job.  (*Id*.)  Plaintiff provided Dr. Sabal's report to Dr. Perlson.  (*Id*. Ex. 15 at 34-35.)

At some point after examining Plaintiff, Dr. Perlson received and reviewed the job description for the Plant Engineer position that Helen O'Brien from the School District faxed to Midwest.  (*Id*. at 20-21; Ex. 16.)  Ms. O'Brien was the Assistant to Assistant Superintendent Charlene Coulson, Ph.D, who was in charge of human resources for the School District at that time. The document Ms. O'Brien faxed to Midwest was the website posting for the Plant Engineer position, which provided a very general description of the job duties.[2]  (*Id*. Ex. 16.)  Dr. Perlson

---

[2]The job duties were described most specifically in the "Job Goal" and "Performance Responsibilities" sections, which stated:

Job Goal:
To perform essential maintenance tasks and coordinate activities with custodial staff to ensure that the building and grounds are a safe, attractive, clean and efficient place in which to learn and work.

(continued...)

7

testified during his deposition that, based on his examination, he concluded that

Plaintiff could do only ground level work and should be restricted from climbing

ladders and lifting more than forty pounds. (*Id*. Ex. 15 at 44.)  Dr. Perlson's

"concerns were that [Plaintiff] did not have the ability to purposely dorsi-flex his

foot up or down as he might have to maneuver while climbing on a ladder" and

that he therefore could lose his balance and fall.  (*Id*.)  Dr. Perlson testified that he

thought a forty pound weight-lifting restriction "was a fair number" based on his

estimation of Plaintiff's strength in his upper extremities, which he assessed by

watching Plaintiff climb onto the examination table.  (*Id*. at 45.)  It is somewhat

unclear from the record, however, whether Dr. Perlson believed these restrictions

---

[2](...continued)
* * *

Performance Responsibilities:
• Report to work on time and on a regular basis.
• Notifies AESOP and Director of Operations when unable to report
to work.
• Performs minor and major maintenance repairs.
• Maintains all power equipment, including boiler, tractor, etc.
• Uses personal automobile for errands that from time to time become
necessary.
• Use of work order system.
• Perform such other duties as directed by the Building
Principal/Director of Operations.

(ECF No. 15 Ex. 16.)

were necessary at the time or in the future.

During his deposition, Dr. Perlson made statements conveying that the restrictions should be in place at the time of his examination; however, he also made statements suggesting that he believed Plaintiff could then do the job without restrictions, but might begin experiencing difficulty and require restrictions in one to two years (or later depending on the rate of his muscle deterioration). (*See id.* at 26-30.) Ms. O'Brien, the School District employee who first spoke with Dr. Perlson regarding his evaluation of Plaintiff, prepared a summary of her September 10, 2010 conversation with Dr. Perlson based on the notes she took during the call. Ms. O'Brien's notes also raise a question as to when Dr. Perlson believed the recommended restrictions were required:

> Healthy at 24 yrs old - **indicating that for now, he was healthy** genetic syndrome of muscle wasting - I asked what this was and he said it was M.S. (Multiple Sclerosis) of sorts
> can deteriorate - indicating that over time, his muscles would weaken
> He is the best he can be right now - indicating that his condition would probably never improve.
> Rehab MD: concurs, can deteriorate - Dr. said he had consulted with a fellow MD in the Rehab area and had read him his findings and that the rehab doctor said based on what Dr. Perlson was reporting that he concurred with his findings.
> Dr Perlson also mentioned that the Rehab doctor said that without his own examination of Adam, he could not put anything in writing.
> cannot flex toes- Dr. said that this was the first indication to him that there was something more to his physical limitations.
> Hire- but would not

9

> **1-2 yrs - OK**
> 2-3 yrs
> -he said that we could hire Adam with the knowledge that **he would probably be able to work without health issues for 1-2 years** but that he thinks that after 2-3 years, he could become a candidate for worker's comp or disability.
> ground level work only
> 40 lb weight limit
> cannot climb ladders - Dr. Perlson concluded that he would report that Adam would have these three restrictions.

(ECF No. 15 Ex. 11 at 1-2, emphasis added.)

Ms. O'Brien shared the information she received from Dr. Perlson with Dr. Coulson and Mr. Nicholls. (*Id.* Ex. 17 at 57-58.) Dr. Coulson and Mr. Nicholls then met on September 10, 2010 to decide whether to hire Plaintiff. (*Id.*; Ex. 13 at 27, 31-33.) According to Ms. O'Brien's notes, she also spoke with Plaintiff on September 10 and was told that his family doctor cleared him to work without restrictions. (ECF No. 15 Ex. 10 at 2; Ex. 11 at 1.)

Based on Dr. Perlson's recommended restrictions, Dr. Coulson and Mr. Nicholls determined that he could not perform the essential functions of the Building Engineer position. (*Id.* at 33-34.) Mr. Nicholls testified during his deposition that it was a somewhat automatic decision to not hire Plaintiff based on the two restrictions Dr. Perlson imposed:

> Q. Okay. Before you gave that recommendation [to not offer employment to Plaintiff] to Char [Dr. Coulson], did you go through it

10

in your head and say hey, when I interviewed the guy and when he wrote in his application he said no problem to all these things and he's doing some of them in his current job, did you weigh that into the balance?

A.  No, I did not.

Q.  Okay.  Why not?

A.  Well, it's the same thing, if someone was a felon and their fingerprints came back that they were a felon, I wouldn't say hey, how bad a felon was he?  I use all three components . . . that's how we hire. We've hired everyone the same way.

Q.  So the information that comes from the doctor, if it restricts them, that is as automatic as information about a felony record or a fingerprint record?

A.  Well, from my standpoint is [sic], as recommendation goes, I would not recommend that person to Char.  As far as from HR, that's up to them.

(ECF No. 15 Ex. 5 at 84-86.)  According to Mr. Nicholls, he was told nothing else about Plaintiff's physical examination and Dr. Perlson's findings other than that Dr. Perlson recommended the weight lifting and ladder work restrictions.  (*Id*. at 75.)

Dr. Coulson recalled having the same limited information concerning Dr. Perlson's findings when she and Mr. Nicholls met.  (*Id*. Ex. 13 at 27.)  Dr. Coulson testified that she neither spoke with Dr. Perlson nor read his report until later.  (*Id*. Ex. 13 at 18, 25.)  According to Dr. Coulson, when she and Mr. Nicholls made

11

their decision, they simply looked at Dr. Perlson's restrictions, determined whether the job position required lifting more than forty pounds and climbing ladders, and if it did, concluded that they could not hire Plaintiff.  (*Id*. at 34-36.)  As she explained:

> Discussions with John [Nicholls] are very short usually.  I think it was just a matter of we looked at each other, we said it appears as though this gentleman can only lift 40 pounds and cannot climb a ladder.  Can we use someone in the capacity of engineer and he's telling me at the same time as I'm asking him this kind of position really requires a lot of lifting and climbing of a ladder and, therefore, I don't think that this person is going to be able to do the job. . . .

(*Id*. at 34.)

Dr. Coulson testified that she did not believe she was capable of contradicting Dr. Perlson:

> We send staff for physical examinations to determine their physical capabilities.  Again, I believe that because the physician is a professional he would give us the professional opinion as to the man's ability and I didn't feel– believe that I was capable of contradicting him.

(*Id*. at 36.).  As a result, neither Dr. Coulson nor Mr. Nicholls considered contrary evidence, such as Plaintiff's ability to perform the duties of his current position or Plaintiff's assertion during his interview with Mr. Nicholls that he could handle the physical requirements of the Building Engineer position.  (*Id*. at 35; Ex. 5 at 85.)

Additionally, Dr. Coulson and Mr. Nicholls did not consider or discuss

12

whether there were reasonable accommodations that would allow Plaintiff to adequately fulfill the responsibilities of the job.  Plaintiff's counsel asked Dr. Coulson during her deposition: "Was there any discussion before the revocation letter was sent to Mr. LaFata revoking the conditional job offer as to whether there was a reasonable accommodation that would have allowed him to adequately fulfill the responsibility of the job?" (*Id*. Ex. 13 at 19.)  Dr. Coulson answered: "The simple answer to that is no." (*Id*.)

After meeting with Mr. Nicholls on September 10, Dr. Coulson prepared a letter to Plaintiff dated September 13, 2010, informing Plaintiff of the decision not to hire him.  (*Id*.)  Dr. Coulson wrote in part:

> We appreciate your interest in a custodial position with Dearborn Heights District #7 Schools, but after your physical last week, the doctor determined that you would only be able to work with some major restrictions.  Considering the type of position that you are seeking, it is not possible for us to employ you with restrictions that indicate you can only work at ground level and cannot lift anything over 40 pounds.

(ECF No. 15 Ex. 14.)  At her deposition, Dr. Coulson could not recall whether she had seen Dr. Perlson's report prior to writing this letter.  (*Id*. Ex. 13 at 25).  However she testified that even if she had seen it, the only portion she could read was the recommended restrictions; the remaining portions of the written report were illegible.  (*Id*. at 26.)

13

On or before September 22, though, Dr. Coulson did receive Dr. Perlson's report and, because it was illegible, Ms. O'Brien called Midwest to inquire about a transcription.  (*See* ECF No. 15 Ex. 11 at 2.)  During the call, Ms. O'Brien was informed that Dr. Perlson wanted to speak with the School District again.  (*Id.*)  Ms. O'Brien and Dr. Coulson then spoke with Dr. Perlson via speaker phone, at which time he read the details of the report and indicated that he would get a transcription to them.  (*Id.*)  The transcription was received on some date after October 5, 2010 (as Ms. O'Brien noted that she called Midwest on that date to again inquire about its status).  (*See id.* Ex. 10 at 5.)

In response to the School District's decision not to hire him, Plaintiff filed this lawsuit on February 22, 2013.  Plaintiff filed an Amended Complaint on February 25, 2013, in which he alleges three claims against the School District: (I) disability discrimination in violation of the ADA; (II) discrimination in violation of Title II of GINA; and (III) disability discrimination and genetic information and/or genetic testing discrimination in violation of Michigan's PWDCRA.

On September 11, 2013, the School District filed its pending motion for summary judgment.  (ECF No. 13.)  Plaintiff filed a response to the motion on October 2, 2013.  (ECF No. 18.).  Plaintiff filed his pending motion for summary judgment on September 15, 2013.  (ECF No. 15.)  The School District filed a

14

response brief on September 30, 2013; and Plaintiff filed a reply brief on October 3, 2013.

On or about October 7, 2013, the parties submitted a stipulated order in which they agreed to the dismissal of Plaintiff's GINA claim (Count II) in its entirety and Plaintiff's PWDCRA claim (Count III) *to the extent that* Plaintiff alleges a violation in the form of genetic information and/or genetic testing discrimination. The Court signed and filed the stipulated order on October 7, 2013. (ECF No. 21.) Thus only Plaintiff's disability discrimination claims under the ADA and PWDCRA remain pending.

## III.   Applicable Law and Analysis

The ADA prohibits covered employers from discriminating against a "qualified individual on the basis of disability" with regard to hiring, advancement, training, termination, and "other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The Sixth Circuit has held that Michigan's PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim."

15

*Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir.2002) (citing *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 n. 3 (6th Cir.1998); *Chiles v. Machine Shop, Inc.*, 238 Mich. App. 462, 606 N.W.2d 398, 405 (1999)), abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 317 (6th Cir. 2012) (en banc).  In this case, the claims and underlying facts regarding both the ADA and the PWDCRA are essentially the same.

Thus to prevail on his claim of disability discrimination under the ADA or PWDCRA, Plaintiff must demonstrate that he: (i) is an individual with a disability; (ii) is otherwise qualified to perform the job requirements, with or without reasonable accommodations; and (iii) suffered an adverse employment action "because of" his disability.  *Holiday v. City of Chattanooga*, 206 F.3d 637, 642 (6th Cir. 2000) (citing 42 U.S.C. § 12112(a); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996)).  Prior to the motion hearing on December 5, 2013, there appeared to be no dispute that Plaintiff has a disability and that the School District revoked its conditional offer of employment because of this disability.  The School District's only argument in support of its summary judgment motion and in response to Plaintiff's motion, was that Plaintiff cannot prove the second element of his disability discrimination claims– i.e., that he was physically qualified to perform the job requirements, with or without reasonable

16

accommodations.  The School District argued that because the ADA permits

employers to require applicants to undergo pre-employment physical examinations,

*see* 29 C.F.R. § 1630.14, it had the right to rely on Dr. Perlson's expert medical

opinion when it decided to withdraw Plaintiff's job offer that he was not able to

engage in two activities that were essential to the Building Engineer position:

working above ground level and lifting more than forty pounds.

At the motion hearing, however, counsel for the School District focused his

argument on whether Plaintiff suffers from a disability.  For the first time, the

School District asserted that Plaintiff cannot show that he is disabled, as defined

under the ADA, because he was working in a similar job before he applied for the

building engineer position and after the conditional offer was revoked.  In support

of its argument, the School District also pointed to Plaintiff's testimony that he is

able to perform the essential functions of the job for which he applied.

Generally, courts will not consider theories or arguments raised for the first

time at oral argument.  *See, e.g., Roberts v. Principi*, 283 F. App'x 325, 332 n. 3

(6th Cir. 2008) ("Because counsel raised the issue only at oral argument, however,

we decline to review it.") (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d

703, 714 (6th Cir. 2001)); *Lane v. LaFollette, Tenn.*, 490 F.3d 410, 420 (6th Cir.

2007) ("For the first time at oral argument, Defendants argued that . . . Defendants

17

. . . have waived this argument by not including it in their brief.") (citing *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005)); *Probst v. Cent. Ohio Youth Ctr.*, 511 F. Supp. 2d 862, 871 (S.D. Ohio 2007) ("It is well established that a moving party may not raise an issue for the first time in its reply brief or at oral argument."); *Van Sickle v. Automatic Data Processing, Inc.*, 952 F. Supp. 1213, 1221 (E.D. Mich. 1997) (holding summary judgment inappropriate on an issue raised for the first time at a hearing, because the opposing party did not have an opportunity to respond).  Perhaps the School District did not raise the argument previously because, as Plaintiff's counsel pointed out at the motion hearing, it contradicts the arguments the School District *did raise* in its briefs: before the motion hearing, the School District argued that Plaintiff is too disabled to perform the building engineer position; now its argument is that he is not disabled. Regardless, the argument lacks merit.

Under the ADA, a person is considered "disabled" if he: (1) has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) has "a record of such impairment;" or (3) is "regarded as having such an impairment."  42 U.S.C. § 12102(1).  "Major life activities" include "working."  29 C.F.R. § 1630.2(*i*)(1)(i).  To be substantially limited in the major life activity of working, the plaintiff must be unable to work in

18

"a broad range of jobs." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491-92, 119 S. Ct. 2139, 2151 (1999), superseded by statute, ADA Amendments Act of 2008, Pub. L. 110-325, 112 Stat. 3353 (2008).[3]  The 2008 Amendments to the ADA, however, expanded the definition of "major life activity" to include "the operation of a major bodily function." 42 U.S.C. § 12102(2)(B).  According to the regulations, this includes musculoskeletal functions, which would seem to cover the muscle wasting apparently caused by Plaintiff's disease.  29 C.F.R. § 1630.2(*i*)(1)(ii).  But even if Plaintiff is not "substantially limited" in his ability to work or musculoskeletal functions, he can demonstrate the first prong of his *prima facie* case by showing that he was "regarded as" disabled by the School District.

     Prior to the 2008 Amendments, a plaintiff could not establish that he or she was "regarded as" disabled by the employer unless the employer believed the plaintiff satisfied the definition of "disabled" under the ADA (i.e., that the plaintiff

─────────────────────

[3]Congress amended the ADA in 2008 to respond, in part, to the Supreme Court's interpretation of the statute.  Specifically, the ADA Amendments Act of 2008 expressly states that both the "severely restricts" and the "significantly restricts" standards of defining substantial limitation were too stringent, and that "the definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act." ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat 3553 (codified at 42 U.S.C. § 12102(4)(A)).  The Amendments took effect on January 1, 2009, and therefore are applicable to Plaintiff's lawsuit as the action complained of occurred in 2010.

was believed to have an impairment that substantially limited a major life activity).
*See Sutton v. United Air Lines, Inc.*, 527 U.S. at 489, 119 S. Ct. at 2149 (1999); 29
C.F.R. § 1630.2(*l*) (2007).   Under the Amendments, however, "[a]n individual
meets the requirement of 'being regarded as having such an impairment' if the
individual establishes that he or she has been subjected to an action prohibited
under this chapter because of an actual or perceived physical or mental impairment
*whether or not* the impairment limits or is perceived to limit a major life activity."
42 U.S.C. § 12102 (emphasis added); *see also* 29 C.F.R. § 1630.2(*l*)(1) (2008).
Based on Dr. Perlson's assessment, the School District undoubtedly regarded
Plaintiff as having a physical impairment.   Thus the Court's inquiry returns to the
School District's original argument: that it had a right to rely on Dr. Perlson's
expert medical opinion when it decided to withdraw Plaintiff's job offer.

The Court rejects the School District's argument for two reasons.   First, the
School District lacked sufficient information to assess whether Dr. Perlson's
opinion was reasonable.   Second, even if Dr. Perlson's recommended restrictions
were reasonable, neither he nor the School District engaged in any analysis to
determine whether a reasonable accommodation would enable Plaintiff to perform

20

the essential functions of the job.[4]

As the Sixth Circuit explained in *Holiday*, the ADA requires "an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position." 206 F.3d at 643. A reasonable trier of fact could not find that the School District engaged in such an individualized inquiry. Dr. Perlson's deposition testimony reflects that his examination of Plaintiff was neither lengthy nor comprehensive. The School District had a duty to review Dr. Perlson's report to assure itself that his examination and analysis were thorough and/or reasonable. *Id.* at 645-46; *see also Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 31-32 (6th Cir. 2002) ("[A]n employer cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions."). "Employers do not escape their legal obligations under the ADA by contracting out certain

---

[4]Counsel for the School District asserted at the motion hearing that Plaintiff cannot prevail because he failed to request an accommodation, citing *Jakubowski v. Christ Hospital, Inc.*, 627 F.3d 195 (6th Cir. 2010). The plaintiff in *Jakubowski*, however, was alleging a violation of the ADA based on a failure to accommodate, not to hire. The Court was not able to locate any case holding that applicants denied a position because of their disabilities must prove that they requested an accommodation (as opposed to proving that a reasonable accommodation was available that would enable them to perform the essential functions of the job). Further, it does not appear that Plaintiff even had an opportunity to make such a request before his job offer was revoked. The Court expects that most applicants denied a position would not have such an opportunity.

21

hiring and personal functions to third parties." *Holiday*, 206 F.3d at 645.

Here, however, none of the School District personnel involved in making the employment decision at issue had even seen Dr. Perlson's report when they accepted his recommended restrictions and concluded that Plaintiff therefore could not fill the job. The information conveyed to Dr. Coulson and Mr. Nicholls by the time they decided to revoke Plaintiff's job offer was minimal: specifically that he suffered from a muscle wasting disease and was restricted to ground level work and lifting of forty pounds or less. They had no basis to evaluate whether the restrictions were reasonably based on Plaintiff's actual physical limitations. As such, this case is distinguishable from *Pesterfield v. Tennessee Valley Authority*, 941 F.2d 437 (6th Cir. 1991), cited by the School District, where the employer based its decision on a "detailed and lengthy" report from the plaintiff's *treating* physician. *Id*. at 441.

It also is distinguishable from *Johnson v. Cleveland City School District*, 443 F. App'x 974 (6th Cir. 2011) (unpublished opinion), and *Manigan v. Southwest Ohio RTA*, 385 F. App'x 472 (6th Cir. 2010) (unpublished opinion)– both also cited by the School District– because in those cases the recommendations came from the plaintiff's own treating physician(s). The School District does cite to one case where the court held that the employer could rely on the conclusions of

22

a non-treating physician who conducted only a preemployment examination of the plaintiff: *Jennings v. Dow Corning Corporation*, No. 12-12227, 2013 WL 1962333, at **11-12 (E.D. Mich. May 10, 2013) (unpublished opinion).  In *Jennings*, however, the doctor not only conducted a physical examination of the plaintiff, but made "an individualized inquiry based on all of [the p]laintiff's up-to-date medical information" (i.e. the medical records from the providers who had treated the plaintiff for back pain and shoulder injuries).  *Id*. at **2-5, 12.  The court found that this "individualized inquiry" offset the fact that the opinion did not come from the plaintiff's treating physician.  *Id*. at 12.

Dr. Perlson was not Plaintiff's treating physician and he based his recommendations on nothing more than a cursory physical examination of Plaintiff.  To bolster Dr. Perlson's examination, the School District states that he "asked a second opinion from another doctor." (*See* ECF No. 13 at Pg ID 81).  Dr. Perlson testified, however, that he simply made a "fast call" to this unidentified doctor to ask him about the disease and to get his impression as to whether what Dr. Perlson observed suggested that Plaintiff suffered from the disease.  (ECF No. 15 Ex. 15 at 32-33.)  The unidentified doctor never examined Plaintiff and never offered an assessment of his then-current physical restrictions.  (*Id*. at 32.)

Moreover, there was evidence available and known to the School District

23

that contradicted Dr. Perlson's recommendations that it did not consider.  First, Plaintiff was performing the very functions at his current position that Dr. Perlson concluded he could not do.  Second, Plaintiff specifically told Mr. Nicholls that he would have no problem with the physical requirements of the Building Engineer position after receiving a description of those requirements.  Finally, Plaintiff's family physician, Dr. Sabel, reported that Plaintiff's "strength [was] more than adequate for his job & daily activities" and that he could work without any restrictions.  The above facts prevent the School District from prevailing on its summary judgment motion.  The following are what entitle Plaintiff to prevail on his motion.

First is the undisputed fact that neither Dr. Perlson nor the School District engaged in *any* analysis to determine whether reasonable accommodations were available that could enable Plaintiff to perform the essential functions of the position despite his disability and purported physical restrictions.  Second is the School District's failure to rebut Plaintiff's showing that he could performs those functions without or, if necessary, with reasonable accommodations.

The ADA defines discrimination as "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Kleiber v. Honda of Am. Mfg., Inc.*, 485

24

F.3d 862, 868 (6th Cir. 2007) (quoting 42 U.S.C. § 12112(a), (b)(5)(A)).

Employers are required under the ADA to engage in an interactive process, a duty

which "is *mandatory* and 'requires communication and good-faith exploration of

possible accommodations.'" *Keith v. Cnty. of Oakland*, 703 F.3d 918, 929 (6th

Cir. 2013) (emphasis added) (quoting *Kleiber*, 485 F.3d at 871). "The purpose of

this process is to 'identify the precise limitations resulting from the disability and

potential reasonable accommodations that could overcome those limitations.' "

*Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)). In its briefs in

support of its motion for summary judgment and in response to Plaintiff's motion,

the School District states that "[a]fter Dr. Coulson learned about the restrictions

placed on Plaintiff's employment by Dr. Perlson, she met with John Nicholls about

whether Plaintiff was going to be able to perform the essential functions of his job,

*with or without accommodations*." (ECF No. 13 at Pg ID 76, emphasis added;

ECF No. 16 at Pg ID 479, emphasis added.) The School District's attorney made

the same claim during oral argument. The record evidence does not support this

assertion, however.

Instead, Dr. Coulson and Mr. Nicholls were clear in their depositions that

there were no discussions during their meeting (or at any other time) as to whether

there was a reasonable accommodation that would allow Plaintiff to adequately

fulfill the duties of the job.  As such, the School District failed to engage in any process to access whether reasonable accommodations existed and Plaintiff has shown that they were available, if necessary (he asserts that they were not). Specifically, in his pleadings, Plaintiff identifies several types of ladders, platforms, tools, and carts that would enable him work at heights without having to "dorsiflex" his feet, that would simulate standing on the floor, and/or assist him in moving heavier loads.  (*See* ECF No. 18 at 5 & Ex. 23; ECF No. 19.)  The School District does not argue that these accommodations would fail or that they are unreasonable.

Plaintiff therefore is entitled to summary judgment.  While the School District claims as a defense that Plaintiff posed a "direct threat" to himself and others as a result of his disability, this defense is doomed by the failure to engage in an interactive process to assess the availability of reasonable accommodations. *See* 42 U.S.C. § 12111(3) (defining a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.").

## IV.   Conclusion

For the above reasons, the Court concludes that the School District failed to engage in the necessary individualized inquiry to determine whether Plaintiff's

26

actual or perceived disability disqualified him from the Building Engineer position. The School District erred in relying on Dr. Perlson's medical opinion where it lacked sufficient information to determine whether it was objectively reasonable and contradictory evidence was available. But even if Dr. Perlson's assessment was correct and the School District could rely on it, the School District never considered whether reasonable accommodations were available that could enable Plaintiff to perform the essential functions of the job he had been offered. Plaintiff has shown that reasonable accommodations were available; an assertion the School District has not rebutted. As a matter of law, therefore, the School District is liable to Plaintiff for disability discrimination in violation of the ADA and PWDCRA.

The Court will schedule a final pretrial conference for a trial on damages.

Accordingly,

**IT IS ORDERED**, that Defendant's motion for summary judgment is **DENIED**;

**IT IS FURTHER ORDERED**, that Plaintiff's motion for summary judgment is **GRANTED**.

Dated: December 11, 2013          s/PATRICK J. DUGGAN
                                  UNITED STATES DISTRICT JUDGE

Copies to:
Kevin M. Carlson, Esq.
Joseph A. Golden, Esq.
Timothy J. Mullins, Esq.
Stephen J. Hitchcock, Esq.
John L. Miller, Esq.